NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the Matter of | : | Case No. 10-16449/JHW |
| Michael A. Salvatore, Sr. | : | |
| Debtor | : | |
| Allison Green | : | Adversary No. 10-01679 |
| Plaintiff | : | |
| v. | : | OPINION |
| Michael A. Salvatore, Sr. | : | |
| Defendant | : | |

APPEARANCES:    Henry J. Tyler, Esq.
736 Chickory Trail
Mullica Hill, New Jersey  08062
Counsel for the Plaintiff

E. Allen Nickerson, Esq.
175 West White Horse Pike
Berlin, New Jersey  08009
Counsel for the Debtor/Defendant

**FILED**

JAMES J. WALDRON, CLERK

May 26, 2011

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: s/ Theresa O'Brien, Judicial
Assistant to Chief Judge Wizmur

In this matter, the plaintiff accuses the debtor/defendant of engaging in unconscionable and fraudulent commercial business practices in violation of the New Jersey Consumer Fraud Act ("NJCFA").  The plaintiff contends that the debtor fraudulently induced her into signing a home improvement contract by making false representations concerning the scope of services and the quality of workmanship that he and/or his company would provide.  The plaintiff seeks a judgment for $43,462.92, trebled to $130,388.76 under the NJCFA, to

cover the costs of repairs to her home, and a determination that her damages are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and/or § 523(a)(6). For the reasons expressed below, the debtor's quest for a judgment pursuant to the NJCFA will be granted, but a declaration that the debt is nondischargeable will be denied.

## FACTS AND PROCEDURAL HISTORY

At some point in 2006, the plaintiff, Allison Green, decided to have her kitchen and two bathrooms in her Cherry Hill home remodeled.  Around that time, Ms. Green received an unsolicited four-page promotional advertisement in the mail from the defendant, Michael A. Salvatore, Sr., the principal of Salvatore General Contractors, Inc. ("SGCI"), a general contracting business. The advertisement contained a page, entitled "What You Should Know About Salvatore General Contracto[r]s, Inc., A Message From the[] Owner," in which the defendant provided thirteen examples of how his company differed from other contractors, including that his employees were "highly skilled, conscientious technicians," their work was "guaranteed," and that with SGCI, there would be no "maintenance headaches." Exh. P-1.  The advertisement claimed that "[i]f you need service, we come back for free." Id.  As is particularly relevant here, in lines 9, 10 and 11, the advertising materials also provided that:

> 9.   We handle all phases of the job, from getting the permits to cleaning up the site and hauling away all debris.

10.  You will receive a written proposal for you[r] project.  You'll always know what we're doing and why we're doing it.

11.  Everything is included, no hidden surprises.

Exh. P-1.


After reading the promotional materials, Green contacted SGCI and arranged to meet with the defendant to discuss the renovations that she envisioned for her home.  The initial meeting took place at her home, on or about October 17, 2006, during which time the parties discussed the general terms of the work to be done.  The plaintiff recalled that she was satisfied with their discussion and that she felt reassured that "if there were any problems that he [Salvatore] would take care of them."[1]  On October 26, 2006, Salvatore returned with three separate written proposals that he had prepared for Green's review and approval, one for each of the three rooms to be renovated. The proposals stated that the contractor would "furnish the materials and perform the labor necessary for the completion of" the specific work outlined with respect to each space.  Exh. P-2.  The list of work to be performed included directions for the contractor to "remove", "install", "add", or "relocate" various items.  All of the construction materials were "guaranteed to be as specified" in the proposal, and the work was "to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner."  Exh. P-2.

---

[1]      T13-3 to 4 (2/1/2011).

3

Green testified that she understood Salvatore to be "a full service contractor and that he would take care of everything, from beginning to end."[2] Although a firm start date for the project was never set forth in writing, Green recalled that Salvatore orally indicated that he would start work on January 5th.  Work did not commence on the project until on or about February 21, 2007.[3]  Green explained that she considered the written representations included in the advertisement to be a part of her agreement with Salvatore. She assumed that "based on the guarantees in his promotional material that whatever was needed, he'd take care of."[4]  Green acknowledged that the issue of building permits for the proposed project did not initially come up prior to the commencement of work on the project, and that she was not concerned about permits until later, when the lack of permits was brought to her attention.

Green testified that it was not until sometime in the middle of May 2007 that she realized that there were no permits.  She recalled that she had separately retained a plumber to replace her hot water heater.  She claimed that Salvatore or one of his workers mentioned to her that the plumber had inquired about permits and stated that since Salvatore had not acquired any, the plumber wasn't going to bother to get one either.  She testified that this

---

[2]      T15-13 to 15 (2/1/2011).
[3]      T16-23 to 25 (2/1/2011).
[4]      T16-4 to 6 (2/1/2011).

4

"was the first I knew that there were no permits.  I had assumed all along that there were permits taken on the house."[5]

Salvatore had a different recollection of the circumstances regarding the lack of permits.  He testified that he mentioned to Ms. Green that "permits may be an issue," and that he offered to inquire as to whether they would be needed in this case. [6]  He explained that if permits were needed, it would involve an additional cost.[7]  Salvatore claimed that Green did not wish to pursue getting the necessary permits and that she stated that "she'd really rather not get into all of that," and so he dropped the issue.[8]  In his opinion, the decision of whether or not to acquire a permit was the homeowner's responsibility.  He explained that whenever he accepted the responsibility for obtaining permits, he specifically included it in the contract because of the additional cost involved.[9]  He acknowledged that in the normal course a permit would have been obtained prior to actually commencing any home improvement work.  He testified that in only one to two percent of his cases had he actually started work without first applying for and obtaining the necessary approvals and permits.[10]  He claimed that in this case, the plaintiff "was acting as her own general contractor and [she] specified that the defendant's role in these home

---

5       T23-11 to 13 (2/1/2011).
6       T13-18 (2/8/2011) .
7       T13-21 (2/8/2011).
8       T13-22 (2/8/2011).
9       T14-8 to 9 (2/8/2011).
10      T47-17 (2/8/2011).

improvements was as set forth in the proposal signed by both parties." Def.

Resp. to Pl. Proposed Findings of Fact and Exh. at 2, ¶ 13.

    While the resolution of the credibility issue between the plaintiff and the

debtor is not critical here, because either version of events would produce the

same results, I have determined to accept the plaintiff's factual recitation.  The

veracity of the debtor's testimony was destroyed when the debtor proffered a

"Certificate of Completion" allegedly signed by Ms. Green on June 13, 2007,

which states that "[t]he installation of kitchen ordered by me has been

completed satisfactorily."  Exh. DS-3.  Green denied signing the certificate and

testified at trial that the signature appearing on the certificate did not belong to

her.  A comparison of the disputed signature with other examples of Ms.

Green's signature, readily available in the record and executed prior to this

sample, raises serious questions as to the authenticity of the proffered

document.  The signature on the Certificate of Completeness is clearly different

from all the other signatures of the plaintiff available in this record.[11]  Although

no expert testimony was presented on this point, the court, as the trier in fact,

has the ability to review and authenticate the evidence presented.  <u>See</u>

Fed.R.Evid. 901(b)(3).[12]  <u>See</u>, <u>e.g.</u>, <u>United States v. Miner</u>, 272 Fed.Appx. 530,

2008 WL 918814 (8th Cir. Apr. 7, 2008) ("The admitted or proved handwriting

---

[11]    <u>See</u>, <u>e.g.</u>, Exh. P-2 through P-5.
[12]    Under New Jersey law, the court retains similar authority to compare signatures
without expert testimony.  <u>See</u> N.J.S.A. 2A:82-1 (providing for the comparison of a signature or
writing); <u>State v. Carroll</u>, 256 N.J. Super. 575, 607 A.2d 1003 (App. Div. 1992) (applying
N.J.S.A. 2A:82-1).

of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person."). <u>See</u> <u>also</u> <u>U.S. v. Saadey</u>, 393 F.3d 669, 679 (6th Cir. 2005) ("the federal rule permits the trier of fact to compare documents with other documents which have been authenticated.  Under Fed. R. Evid. 901(b)(3), a lay person can identify and compare signatures."); <u>Arnold v. Motley</u>, No. 06-P204-C, 2009 WL 3064879, *2 (W.D.Ky. Sept. 22, 2009) ("901(b)(3) permits the trier of fact to authenticate or identify evidence by comparing it with specimens which have been authenticated").

In any event, Salvatore's proposals were accepted and signed by Green. It is uncontested that the necessary building and/or construction permits for this project were never applied for or obtained by either party.

Pursuant to the written agreement between the parties, the plaintiff was obligated to pay Salvatore on an installment basis at various stages of completion in the project.  The plaintiff complied with the payment schedule as each stage was completed.

On June 13, 2007, Salvatore informed Green that the kitchen portion of the renovations project had been completed.  Green performed a perfunctory inspection of the work in the kitchen and issued Salvatore a check in the amount of $1,170.09 with the notation, "kitchen finished" on the memo line.

7

Salvatore then continued with the scheduled renovations to Green's upstairs and downstairs bathrooms. Approximately two weeks later, on June 29, 2007, the debtor finished work on the project. The total price of the project was $43,462.92. Green tendered a final check to the defendant in connection with the remodeling project in the amount of $2,091.00.

Green completed a casual inspection of Salvatore's work and issued him his final payment for the project, minus $360, which Salvatore agreed to be withheld as a sign of good faith that he would return to address any concerns that Green might have following an opportunity to completely inspect his work.[13] Over the next several days following the completion of the renovations, Green began to notice significant deficiencies in the work performed by the defendant. Characterizing the renovations as defective and "[a]esthetically . . . distasteful,"[14] Ms. Green complained about large white stains that suddenly appeared on her kitchen panels, a defective pocket door, buckling laminate, missing or poorly aligned trim, faulty wiring and plumbing, and a host of other discrepancies that she later memorialized in a punch list. Exh. DS-4. Green reached out to the defendant in an effort to get him to return to her home and repair the defective conditions, to no avail.

---

[13]    The debtor contends that the $360 represented an open invoice covering other aspects of the project that were not included in the original proposals. Because the debtor's credibility has been impugned, the plaintiff's factual recitation will be accepted.
[14]    T25-23 (2/1/2011).

8

On September 19, 2007, Green's lawyer mailed Salvatore notification that the work performed on the plaintiff's home was in violation of New Jersey building code standards and requested that Salvatore return to Green's home to repair or replace the defective items.  Salvatore revisited the Green home to evaluate the items specified in the letter, but he declined to remedy the discrepancies.  He advised Green's lawyer that there remained an outstanding invoice on the project for $360, and that he would not return to address Green's concerns until this amount was paid.

After the parties were unable to reach an agreement regarding the defendant's responsibility to make repairs, the plaintiff filed a complaint under the New Jersey Consumer Fraud Act against the defendant on February 13, 2008 in the New Jersey Superior Court, Law Division, Camden County, case number CAM-L-000898-08.  Approximately two years later, on March 5, 2010, the defendant filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code, staying the state court matter.  The debtor listed Allison Green as a non-priority unsecured claimant with a claim valued at $0.00 in Schedule F.[15]  The debtor's Chapter 13 plan proposed to pay $299 for 36 months and to provide a dividend of $6,776 to be distributed pro rata among the allowed non-priority unsecured claims.[16]

---

[15]     The debtor listed unsecured nonpriority claims total $11,072.00.
[16]     The debtor's plan was confirmed by order dated August 12, 2010 at $325 a month for 31 months with direction that if the debt at issue in this case was determined to be nondischargeable, the debtor would amend his plan to provide for this claim.

On May 28, 2010, the plaintiff filed a proof of claim in the amount of
$143,343.16, an objection to confirmation of the debtor's Chapter 13 plan, and
this adversary complaint.  The plaintiff seeks here a judgment for the repair
costs to her home, pursuant to the New Jersey Consumer Fraud Act, N.J.S.A.
56:8-1 et seq., along with a determination that these damages are
nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and/or 11 U.S.C. §
523(a)(6).

Trial in this matter was held on February 1, 2011 and February 8, 2011,
and final decision was reserved.

## **DISCUSSION**

The plaintiff asserts that the debtor's poor quality of workmanship in
performing renovations to her home led to her need to seek repairs.  She seeks
a judgment against the debtor to cover the cost of those repairs.  She also
contends that the debtor fraudulently induced her into signing a home
improvement contract by making false representations concerning the scope of
services that would be provided.  Moreover, she claims that his actions during
the renovation project violated several of the state regulations governing home
improvement projects, constituting a cause of action under the New Jersey
Consumer Fraud Act.  The plaintiff seeks a judgment to cover her damages in
the amount of $43,462.92, trebled to $130,388.76 pursuant to the NJCFA, and

a determination that her claim is nondischargeable pursuant to 11 U.S.C. §

523(a)(2)(A) and/or § 523(a)(6).  We turn first to address the plaintiff's cause of

action under the New Jersey Consumer Fraud Act.


I.      New Jersey Consumer Fraud Act.


        The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. ("NJCFA" or

the "Act"), "has three main purposes:  to compensate the victim for his or her

actual loss; to punish the wrongdoer through the award of treble damages;

and, by way of the counsel fee provision, to attract competent counsel to

counteract the community scourge of fraud by providing an incentive for an

attorney to take a case involving a minor loss to the individual."  Lettenmaier v.

Lube Connection, Inc., 162 N.J. 134, 139, 741 A.2d 591, 593 (1999); Czmyr v.

Avalanche Heating & Air Conditioning, Inc., No. A-1674-09T1, 2011 WL

519871, *4 (N.J. App. Div. Feb. 16, 2011).  The Act was adopted to promote

"truth and fair dealing in the market place."  Scibek v. Longette, 339 N.J.

Super. 72, 78, 770 A.2d 1242, 1246 (App. Div. 2001); Joe D'Egidio

Landscaping, Inc. v. Apicella, 337 N.J. Super. 252, 258, 766 A.2d 1164, 1167

(App. Div. 2001).  It serves as a check against unlawful practices and false

advertising, and it affords an individual with the right to pursue a private

cause of action.  See N.J.S.A. 56:8-19 (providing for a private right of recovery);

Lee v. Carter-Reed Co., L.L.C., 203 N.J. 496, 521, 4 A.3d 561, 576 (2010) (a

plaintiff may proceed with a private right of action if he can show that he

suffered an "ascertainable loss" as a result of the defendant's use of an

"unlawful practice").  As remedial legislation, the New Jersey Supreme Court

has directed that the Act "should be construed liberally in favor of consumers."

Cox v. Sears Roebuck & Co., 138 N.J. 2, 15, 647 A.2d 454, 461 (1994); Allen v.

V and A Bros., Inc., 414 N.J. Super. 152, 156, 997 A.2d 1067, 1069 (App.

Div.), certif. granted, 204 N.J. 40, 6 A.3d 443 (2010).  Under the Act, a party

that establishes "(1) an unlawful practice, (2) an 'ascertainable loss,' and (3) 'a

causal relationship between the unlawful conduct and the ascertainable loss,'"

may recover damages, treble damages and reasonable attorneys' fees.  Cox, 138

N.J. at 15, 647 A.2d at 461.


    A.    <u>Unlawful Practice</u>.


    The spectrum of unlawful practices that are sanctionable under the Act

can be broken down into three categories:  (1) affirmative acts; (2) knowing

omissions; and (3) regulatory violations.  Thiedemann v. Mercedes-Benz USA,

LLC, 183 N.J. 234, 245, 872 A.2d 783, 790-91 (2005); Cox v. Sears Roebuck &

Co., 138 N.J. 2, 17, 647 A.2d 454, 462 (1994); Stoecker v. Echevarria, 408 N.J.

Super. 597, 623, 975 A.2d 975, 991 (App. Div.), certif. denied, 200 N.J. 549,

985 A.2d 647 (2009).  The first two categories, affirmative acts and knowing

omissions, are described in N.J.S.A. 56:8-2.  The third category, regulatory

violations, is predicated upon violations of the regulatory provisions adopted


12

pursuant to N.J.S.A. 56:8-4. In this case, the plaintiff alleges that the
defendant violated both the first and third categories.

       1.   <u>Affirmative Acts</u>.

The first category, "affirmative acts" is defined under the Act to include
unconscionable commercial practices, fraud, deception, false promise, false
pretense, and misrepresentation. N.J.S.A. 56:8-2. Liability under this category
does not require proof of intent to commit an unlawful act, or even evidence
that the plaintiff was actually misled or deceived. N.J.S.A. 56:8-2; <u>Cox</u>, 138
N.J. at 17-18, 647 A.2d at 462. "An 'affirmative act' may be established by
showing that a defendant's actions constituted one of the stated prohibited
practices." <u>Thiedemann</u>, 183 N.J. at 245, 872 A.2d at 791. To be classified as
an affirmative misrepresentation, the challenged statement must be material to
the transaction, made to induce the plaintiff to enter into the agreement and
determined to be false. <u>Gennari v. Weichert Co. Realtors</u>, 148 N.J. 582, 607,
691 A.2d 350, 366 (1997). A statement is material to the transaction if:

> (a) a reasonable person would attach importance to its existence in
> determining a choice of action ...; or (b) the maker of the
> representation knows or has reason to know that its recipient
> regards or is likely to regard the matter as important in
> determining his choice of action, although a reasonable man would
> not so regard it.

<u>Ji v. Palmer</u>, 333 N.J. Super. 451, 462, 755 A.2d 1221, 1228 (App. Div. 2000)
(quoting Restatement (Second) of Torts § 538(2) (1977)). To qualify as an

inducement for the plaintiff, the representation must also have been made

contemporaneously with the agreement.  Cole v. Laughrey Funeral Home, 376

N.J. Super. 135, 144, 869 A.2d 457, 462-63 (App. Div. 2005).


The plaintiff alleges here that the defendant misrepresented his intention

to obtain the permits necessary to begin the job and that the work would be

completed in a "good workmanlike manner."  These alleged misrepresentations

were included in the promotional materials prepared and mailed by the

defendant.  In response, the defendant maintains that the advertising materials

in this case were not a part of the final formal agreement between the parties

and in any event they would have been superseded by the terms of the

agreement.


The fact that the terms of the agreement between the parties did not

reference the obligation to obtain permits, or that the work would be completed

in a "good workmanlike manner" does not shield the defendant's advertisement

from application of the Act.  In the case of an advertisement,[17] even if the

representations/statements made are true, the advertisement itself may still

constitute a violation of the Act if the "advertisement has the capacity to

mislead the average consumer."  Union Ink Co., Inc. v. AT&T Corp., 352 N.J.

---

[17]    The Act defines the term "advertisement" as any "attempt directly or indirectly by
publication, dissemination, solicitation, indorsement or circulation or in any other way to
induce directly or indirectly any person to enter or not enter into any obligation."  N.J.S.A.
56:8-1(a).  It is undisputed that the materials mailed here were an attempt to solicit new
business, and therefore qualify as an "advertisement" within the meaning of the "Act."

Super. 617, 644, 801 A.2d 361, 379 (App. Div.), certif. denied, 174 N.J. 547,

810 A.2d 66 (2002).  See also Adamson v. Ortho-McNeil Pharmaceutical, Inc.,

463 F.Supp.2d 496, 501 (D.N.J. 2006), reconsid. denied, No. CIV.A.06-

866(FLW), 2007 WL 604790 (D.N.J. Feb 20, 2007) ("To state a claim under the

CFA, an advertisement must have 'the capacity to mislead the average

consumer.' ") (internal citations omitted).  In the context of an affirmative act,

there is no issue of reliance.  Under N.J.S.A. 56:8-2, a misrepresentation may

constitute an unlawful practice even if no "person has in fact been misled,

deceived or damaged thereby."  Whether the representation is sufficiently

misleading to constitute a violation of the Act or mere puffery is a question of

fact.  Union Ink Co., 352 N.J. Super. at 645, 801 A.2d at 379.


Here, as to the statement in the advertisement that "We handle all

phases of the job, from getting the permits to cleaning up the site and hauling

away all debris," I can readily conclude that several of the elements of

affirmative misrepresentation, including that the statement is material to the

transaction, that the statement was made to induce the plaintiff to enter into

the agreement, and that the statement must have been made

contemporaneously with the agreement, are established on this record.  On the

issue of materiality, the acquisition of a building or construction permit is

material to a home renovation contract, in light of the fact that obtaining a

permit is a prerequisite for most home renovation projects under state and

local law.  As to inducement, there can be little dispute that the reference to

obtaining permits was included in the solicitation materials as an incentive for

prospective clients to retain SGCI's services.  It is apparent that the statements

included in the ad were intended to alleviate the prospective client's concerns

regarding the pitfalls of potential home improvement projects, for example:

"highly skilled, conscientious technicians," "do everything possible," "provide

you with the most value for your money," "No maintenance headaches,"

"guaranteed," "handle all phases of the job," and "Everything is included, no

hidden surprises."  And as to the issue of whether the advertisement and the

agreement were contemporaneous, the timing between the receipt of the

solicitation materials and the first meeting between the parties is sufficiently

close to be considered contemporaneous.


The question remaining is whether the advertisement had the capacity to

mislead an average consumer by its reference to acquiring permits.  Line #9 of

the advertisement states that the defendant and/or his company "handle all

phases of the job."  There are of course two ways of interpreting this statement.

The plaintiff reads it as an affirmative claim that the company <u>will</u> "handle[] all

phases of the job" <u>including</u> "getting the permits."  The defendant reads it as an

example of the work that they can be contracted to do.  In other words, they

<u>can</u> "handle all phases of the job," <u>including</u> "getting the permits."

Notwithstanding the defendant's alternate suggestion, the potential is there for

the average consumer to assume that the contractor would be handling all

phases of the job, including applying for and obtaining the necessary permits

to commence the work.  With the added statement in Line #11 that "[e]verything is included, no hidden surprises," it is not unreasonable for the prospective client to assume that the contractor would be responsible for obtaining all of the necessary permits to commence working on the project. Regardless of intent or actual reliance, I conclude that this statement constitutes more than mere "puffery" and falls closer to those types of misrepresentations that trigger the application of the Act.  See, e.g., Vagias v. Woodmont Props., L.L.C., 384 N.J. Super. 129, 134-35, 894 A.2d 68, 71-72 (App. Div. 2006) (real estate broker's misrepresentation regarding the area that a home was located in "were not idle comments or mere puffery" but rather integral to the buyers' decision to purchase the home); Lingar v. Live-In Companions, Inc., 300 N.J. Super. 22, 29, 692 A.2d 61, 64 (App. Div. 1997) ("The statements made were 'susceptible of personal knowledge,' and were represented in such a way 'that the consumer could reasonably treat [them] as [declarations] of fact.'") (internal citations omitted).  With regard to the statement in the advertisement that the defendant's company would handle all aspects of a project, including getting the permits, the plaintiff has satisfied the elements necessary to establish an affirmative misrepresentation under the Act.

The statement in the advertisement that the work would be performed in a "good workmanlike manner" is more difficult to characterize as an affirmative misrepresentation under the Act.  The allegation actually has two prongs:  an

17

assertion that the debtor misrepresented the quality of the work that he would

perform and that the poor quality of the work itself constituted an

unconscionable commercial practice. The assertion that the debtor would

perform in a "highly skilled, conscientious manner" is more akin to puffery

than to a misrepresentation capable of misleading a reasonable consumer. The

defendant's statements in this regard in the advertisement are made in a

vacuum, without any reference to the work that might be requested. It is not

an actionable statement.

Nor does the defendant's poor workmanship constitute an

unconscionable commercial practice for purposes of the NJCFA. <u>Cox v. Sears

Roebuck & Co.</u>, 138 N.J. 2, 20, 647 A.2d 454, 463 (1994). In <u>Cox</u>, the plaintiff

established that the defendant performed various services improperly. The

court noted that the plaintiff had relied upon the defendant to provide him with

a safe and usable space, and that the failure to do so constituted a breach of

contract. The court concluded that the defendant's "poor performance created

several concealed hazardous defects that could constitute a 'substantial

aggravating circumstance' warranting a finding of an unconscionable

commercial practice." <u>Id</u>. Nonetheless, the court determined that because the

court did "not detect any bad faith or lack of fair dealing on the part of [the

defendant], we conclude that the breach of contract does not rise to the level of

an 'unconscionable commercial practice' in violation of the Act." <u>Id</u>. Likewise

in this case, there is no evidence of any bad faith or lack of fair dealing in the

defendant's work performance.  The work quality may have proven to have
been inferior, but poor performance does not rise to the level of an
unconscionable commercial practice.

In the alternative, the defendant's regulatory violations constitute an
unlawful practice under the NJCFA.

2.   Regulatory Violations.

Regulatory violations are subject to a standard of strict liability under the
NJCFA.  Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 556, 964 A.2d 741,
748-49 (2009); Cox v. Sears Roebuck & Co., 138 N.J. 2, 18, 647 A.2d 454, 462
(1994); Dream Builders v. Estate of Paton, No. A-0493-08T3, 2010 WL
1924776, *3 (N.J. App. Div. May 14, 2010).  The plaintiff asserts here that the
defendant's conduct with respect to her home renovation contract directly
violated several regulations promulgated with respect to the NJCFA.
Specifically, the plaintiff contends that the defendant:  (1) failed to obtain all of
the applicable state and local building permits before commencing the work, in
contravention of N.J.A.C. 13:45A-16.2(a)(10)(i); (2) failed to provide the plaintiff
with copies of all inspection certificates evidencing the inspection and proper
completion of the work, in violation of N.J.A.C. 13:45A-16.2(a)(6)(v), and (3)
failed to state the dates or time period on which work was to begin and be
completed in the written and agreed upon proposals, in contravention of

N.J.A.C. 13:45A-16.2(a)(12)(iv).  In response, the debtor does not address the

written start date requirement, which alone constitutes a violation of the Act.

Nor does the debtor dispute that he did not obtain the required building

permits or inspection certificates required under the regulations.  Instead, he

contends that it was the plaintiff's choice to decide whether or not permits

would be obtained, thus triggering inspections in the normal course.  Since the

inspections did not occur, he did not provide copies of the reports.


       The New Jersey Administrative Code provides that certain acts and

practices related to the performance of home improvement contracts are

unlawful, including commencing work prior to verifying that "all applicable

state or local building and construction permits have been issued as required

under state laws or local ordinances."  N.J.A.C. 13:45A-16.2(a)(10)(i).  The

regulations do not place the burden on the contractor to obtain the permits,

but they do prohibit commencing work prior to being "sure" that the permits, if

required, have been obtained.  N.J.A.C. 13:45A-16.2(a)(10)(i) ("No seller

contracting for the making of home improvements shall commence work until

he is sure that all applicable state or local building and construction permits

have been issued as required under state laws or local ordinances."  The

contractor may contractually pass the burden of obtaining the permits on to

the homeowner, but he may not contract away his responsibility to otherwise

comply with the law.  The defendant's failure to ensure that the appropriate

permits were in place and that the work was properly inspected by local

officials constitutes a violation of the Act.  Intent is not an element under this portion of the test.

B.    Ascertainable Loss.

The second requisite element of an Act violation is an "ascertainable loss," which is defined as a loss that is "'quantifiable or measurable'; it is not 'hypothetical or illusory.'" Lee v. Carter-Reed Co., L.L.C., 203 N.J. 496, 522, 4 A.3d 561, 576 (2010) (quoting Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248, 872 A.2d 783 (2005)).  See also Giaccio v. Hudson Toyota, No. A-3330-09T3, 2011 WL 292011, *4 (N.J. App. Div. Feb. 1, 2011) ("A theoretical loss is not sufficient.").  Such losses include out of pocket losses and replacement costs.

The damages in this case are not illusory or hypothetical.  The evidence presented regarding the remedial costs to fix the significant problems created by the debtor is sufficient to constitute an "ascertainable loss" under the Act. The amount of damages sustained by the plaintiff is not at issue here.  The debtor challenges the existence of a claim under the Act, but does not seek to reduce the amount sought.[18]  I conclude that the debtor has established the second element of the test to determine whether an Act violation has occurred.

---

[18]      T116-3 to 11 (2/8/2011).

C.    <u>Causal Relationship</u>.


Having determined that the defendant committed an unlawful practice

and that the plaintiff has suffered an ascertainable loss, the remaining element

to establish an Act violation is a causal relationship between the act and the

resultant loss.  The New Jersey Supreme Court recently reiterated that

establishing "causation" under Act is not the same as showing reliance in a

typical fraud action.  <u>Lee</u>, 203 N.J. at 522, 4 A.3d at 577.  "To establish

causation, a consumer merely needs to demonstrate that he or she suffered an

ascertainable loss 'as a result of' the unlawful practice."  <u>Id</u>. (citing to N.J.S.A.

56:8-19).


The question here is not whether the plaintiff suffered an ascertainable

loss as a result of the defendant's poor workmanship, but whether the loss was

occasioned as a result of the defendant's misrepresentations and regulatory

violations.  If the appropriate permits had been obtained prior to the start of

the work in this case, the issuance of the permits would have triggered regular

inspections by local township officials.  These officials are tasked with the

responsibility to ensure that the work is being conducted in accordance with all

relevant building code provisions.  In this case, the failure to obtain the permits

removed the inspection component for the renovation process, allowing

apparently substandard work to continue unimpeded.  I can conclude that the

defendant's failure in this regard precluded otherwise mandated inspections,

and thus created a causal relationship between his affirmative actions and regulatory violations, and the losses sustained by the plaintiff.

On this record, the plaintiff has successfully carried her burden to establish a claim under the New Jersey Consumer Fraud Act.

We turn then to consider whether the plaintiff's claim is entitled to a determination of nondischargeability pursuant to either 11 U.S.C. § 523(a)(2)(A) or 11 U.S.C. § 523(a)(6).

II.     Nondischargeability Under 11 U.S.C. § 523.

The burden under both 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(6) is upon the plaintiff to prove her case by a preponderance of the evidence.  See Grogan v. Garner, 498 U.S. 279, 288, 111 S. Ct. 654, 660, 112 L.Ed.2d 755 (1991) ("Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions."); In re Freier, 604 F.3d 583, 587 (8th Cir. 2010) (preponderance standard applies to § 523(a)(2)(A)); In re Hilley, 124 Fed. Appx. 81, 82 (3d Cir. 2005) (§ 523(a)(2)(A)); In re Singer, No. 10-00045(FLW), 2010 WL 3732944, *4 (D.N.J. Sept. 17, 2010) (§ 523(a)(6)).

A.     Section 523(a)(2)(A).


Debts obtained through fraud are generally nondischargeable under 11

U.S.C. § 523(a)(2)(A) which provides that:

> (a)  A discharge under section 727, 1141, 1228(a), 1228(b),
> or 1328(b) of this title does not discharge an individual debtor from
> any debt –
> > . . .
>
> > (2)  for money, property, services, or an extension,
> renewal, or refinancing of credit, to the extent obtained by –
>
> > > (A)  false pretenses, a false representation, or
> actual fraud, other than a statement respecting the debtor's or an
> insider's financial condition.

Section 523(a)(2)(A) conditions nondischargeability on the plaintiff's ability to

establish that the debt in question was obtained as the result of the debtor's

false pretenses, false representations or actual fraud.  Statements regarding

the debtor's financial condition are addressed in subsection (a)(2)(B).  The

purpose behind this provision is "'to prevent a debtor from retaining the

benefits of property obtained by fraudulent means and to ensure that the relief

intended for honest debtors does not go to dishonest debtors.'"  In re Slyman,

234 F.3d 1081, 1085 (9th Cir. 2000) (quoting 4 Lawrence P. King, Collier on

Bankruptcy, ¶ 523.08[1][a] (15th Ed. Rev. 2000)).  Section 523(a)(2)(A) was

designed to cover frauds which involve "moral turpitude or intentional wrong";

"'fraud implied in law which may exist without imputation of bad faith or

immorality, is insufficient.'"  In re Bailey, 34 Fed.Appx. 150, *1, 2002 WL

494325 (5th Cir. 2002) (quoting In re Allison, 560 F.2d 481, 483 (5th Cir. 1992));

In re Reath, 368 B.R. 415, 422 (Bankr. D.N.J. 2006).

Section 523(a)(2)(A) does not define the terms "false pretenses", "false

representation" or "actual fraud," nor does it expressly refer to the typical

common law fraud elements, such as the plaintiff's reliance, the materiality of

the misrepresentation or the debtor's intent.[19]   Nonetheless, in applying section

523(a)(2)(A), courts have routinely inferred that a plaintiff must establish

intent, reliance and materiality.  See, e.g., Field v. Mans, 516 U.S. 59, 68, 116

S. Ct. 437, 443, 133 L.Ed.2d 351 (1995) (courts have "routinely requir[ed]

intent, reliance, and materiality before applying § 523(a)(2)(A)"); In re Softcheck,

No. 08-23844(RTL), 2009 WL 4747527, *6 (Bankr. D.N.J. Dec. 4, 2009).  In

fashioning a standard, some courts have determined that a false representation

or false pretense, for purposes of section 523(a)(2)(A), involves:  "(1) knowing

and fraudulent falsehoods, (2) describing past or current facts, (3) that were

relied upon by the other party."  In re Allison, 960 F.2d 481, 483 (5th Cir.

1992); RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1293 (5th Cir. 1995).  See

In re Suarez, No. 08-15732, 2010 WL 1382110, *15 (Bankr. D.N.J. Apr. 5,

2010) (false pretenses or a false representation involves creating a "false

impression" or making a "false or misleading statement about something").

---

[19]   In contrast, section 523(a)(2)(B) specifically requires the debt to be incurred through the
use of a written statement:  (1) regarding the debtor's financial condition; (2) that was
materially false; (3) upon which the plaintiff had reasonably relied; and (4) which the debtor
made or published with the intent to deceive the creditor.  In re Cohn, 54 F.3d 1108, 1114 (3d
Cir. 1995).

Actual fraud "'consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another-- something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.'" RecoverEdge L.P., 44 F.3d at 1293 (quoting 4 Lawrence P. King, Collier on Bankruptcy ¶ 523.08[5] at 523-57 to -58 (15th Ed. Rev. 1994)). See also In re Bashlow Realty Co. v. Zakai, No. 08-2040, 2010 WL 1529568, *7 n.1 (Bankr. D.N.J. Apr. 14, 2010) (identifying actual fraud as "more expansive than a mere misrepresentation").

Breaking section 523(a)(2)(A) down into its component elements, to satisfy her burden, the plaintiff must demonstrate that the debtor:

(a) obtained money, property or services;
(b) after falsely representing a material fact, opinion, intention or law;
(c) that the debtor knew at the time was false (or was made with reckless disregard for its truth);
(d) the debtor intended that the plaintiff rely on that statement;
(e) the plaintiff actually relied on the statement and the reliance was justified, and
(f) the plaintiff sustained damages as the proximate result of the false representation.

See In re Softcheck, No. 08-23844(RTL), 2009 WL 4747527, *6-7 (Bankr. D.N.J. Dec. 4, 2009) (discussing the elements of § 523(a)(2)(A)) (citing to In re Cohen, 191 B.R. 599, 604 (D.N.J. 1996), aff'd, 106 F.3d 52 (3d Cir. 1997), aff'd, 523 U.S. 213, 118 S. Ct. 1212, 140 L. Ed.2d 341 (1998)). See also In re Reynolds, 193 B.R. 195, 200 (D.N.J. 1996). Even if we conclude that all of the other elements of § 523(a)(2)(A) have been established, the plaintiff's quest for a

declaration of nondischargeability on § 523(a)(2)(A) grounds fails because the

plaintiff has not been able to establish a material misrepresentation, knowledge

that the representation was false, or the debtor's intent to deceive the plaintiff.


      1.    <u>Material Misrepresentation</u>.


To establish nondischargeability under § 523(a)(2)(A), the plaintiff must

show that the debtor made a "material" misrepresentation of a fact, opinion,

intention or law.  <u>In re Ingalls</u>, No. 08-31908, 2010 WL 624089, *2-3 (Bankr.

D.N.J. Feb. 19, 2010).  <u>See</u> <u>also</u> <u>In re Cohen</u>, 191 B.R. 599, 604 (D.N.J. 1996),

<u>aff'd</u>, 106 F.3d 52 (3d Cir. 1997), <u>aff'd</u>, 523 U.S. 213, 118 S. Ct. 1212, 140 L.

Ed.2d 341 (1998); <u>In re Dinter</u>, No. 93-3823, 1993 WL 484201, *5 (D.N.J. Nov.

19, 1993), <u>aff'd</u>, 31 F.3d 1171 (3d Cir. 1994).  The false representation must be

sufficiently material to have caused the plaintiff to act where she would not

have done so had she known the truth.  <u>In re Dunston</u>, 146 B.R. 269, 275 (D.

Colo. 1992).  <u>See</u> <u>also</u> <u>Haxby v. National Boulevard Bank of Chicago</u>, 90 B.R.

340 (N.D. Ill. 1988); <u>In re Evans</u>, 181 B.R. 508, 515 (Bankr. S.D. Cal. 1995).


"In cases specifically involving contractor-debtors, there are usually two

ways to establish misrepresentation or fraud under section 523(a)(2)(A):  (1) to

show that the contractor executed the contract never intending to comply with

its terms, or (2) to demonstrate that the contractor intentionally

misrepresented a material fact or qualification when soliciting the work."  <u>In re</u>

Wiszniewski, No. 09–11102, 2010 WL 3488960, *5 (Bankr. N.D.Ill. Aug. 31,

2010).  A contractor's general representations regarding his expected work

performance and the actual quality of that workmanship do not qualify as

misrepresentations for purposes of section 523(a)(2)(A).  For example, in

Wiszniewski, the court determined that contractual language stating that the

work would be performed "in a professional manner according to standard

practices," and an oral representation that a higher quality floor would be

installed, qualified as "broken promises," but not misrepresentations.  The

court explained:

> Neither of these statements constitutes a misrepresentation under
> section 523(a)(2)(A).  As to the written provision in the contract,
> language in a sales agreement stating that a contractor will
> complete a construction project in a workmanlike manner
> according to specifications or industry standards does not amount
> to a misrepresentation just because the contractor breaks that
> promise.  Similarly, the Defendant's oral representation that "new"
> and "upgraded" subflooring would be needed—and his subsequent
> failure to install that subflooring—constituted a broken promise,
> not a misrepresentation.
>
> Although the Defendant's failure to install the new
> subflooring and generally complete the work according to standard
> practices may amount to a breach of contract, more than mere
> nonperformance is required to show a misrepresentation under
> section 523(a)(2)(A).

Id. at *6 (internal citations omitted).  In the absence of something more, poor

quality workmanship does not equate with a misrepresentation.  See, e.g., In re

Henderson, 423 B.R. 598, 622 (Bankr. N.D.N.Y. 2010) ("Substandard

performance or a mere breach of the construction contract do not rise to the

level of fraud necessary to except the debt from discharge."); In re Rodruck, No.

07–01872–LMJ7, 2010 WL 1740792 (Bankr. S.D.Iowa April 28, 2010); In re

Horton, 372 B.R. 349, 358 (Bankr. W.D.Ky. 2007) ("proof of the performance of

substandard work [cannot be equated] with proof of fraudulent intent.

Moreover, such a precedent could not feasibly exist without elevating nearly

every breach of contract action to a level of actionable fraud."); In re Barr, 194

B.R. 1009, 1019 (Bankr. N.D.Ill. 1996) (a "botched job", without more, is not

the same as a misrepresentation).  To the extent that the plaintiff alleges that

the defendant's poor workmanship is a basis for nondischargeability under

section 523(a)(2)(A), that relief must be denied. [20]

Turning our focus on the issue of materiality to the representation made

in the debtor's advertising materials regarding the acquisition of permits, a

representation of this nature may be material to a prospective client to consider

retaining the services of the contractor.  But other necessary elements of §

523(a)(2)(A), including the debtor's knowledge that the representation was false,

and intent to deceive, are not demonstrated on this record.

2.    Knowledge That the Representation Was False.

A successful nondischargeability action under § 523(a)(2)(A) requires a

showing that the debtor, at the time that he made the representations or

omissions, knew that those representations were false, or that they were made

---

[20]    The plaintiff only raises the issue of poor workmanship with respect to section 523(a)(6)
and does not discuss it in the context of section 523(a)(2)(A).

with gross recklessness as to their truth. In re Cohen, 191 B.R. 599, 605

(D.N.J. 1996) ("[P]roof of reckless indifference to the truth will satisfy both the

knowledge and intent to deceive prongs of § 523(a)(2)(A)."); In re Dinter, 1993

WL 484201 at *5. By reckless conduct, we refer to "unreasonable conduct in

disregard of a known or obvious risk from which it is highly probable that harm

would follow.'" In re Cohen, 191 B.R. at 605 (quoting In re Woolley, 145 B.R.

830, 834 (Bankr. E.D. Va. 1991)).

> "It is usually accompanied by a conscious indifference to the
> consequences. In contrast, negligence is characterized as mere
> thoughtlessness or inadvertence or simple inattention." Hence,
> "[w]here the knowledge element is based on recklessness, the
> conduct must exceed negligence and rise to the level of reckless
> disregard for truth. . . . Recklessness is usually determined by a
> pattern of conduct." Lastly, . . . if the totality of the circumstances
> exhibit a debtor's reckless disregard of the truth, a finding of intent
> or knowledge cannot be overcome simply by an "unsupported
> assertion of honest intent."

Id. (citations omitted).


Here, I cannot conclude that the debtor, at the time that he made the

representations in the advertising materials, knew that those representations

with respect to acquiring the permits were false, or that the representations

were made with gross recklessness as to their truth. The statement in the

solicitation reflected that the defendant "handle[s] all phases of the job,"

including getting the necessary permits and preapprovals. At the time that the

solicitation was mailed (to an unknown number of recipients), the debtor had

no way of knowing whether permits for a prospective future job would be

required.  His representation in this regard is simply that in the normal course,

he handles getting the permits.  I cannot conclude on this record that the

defendant knew at the time that this representation was false or that he

recklessly disregarded the possibility.  The standard under section 523(a)(2)(A)

in this regard is different than that under the NJCFA, which only considers

whether the advertisement has the potential to be misleading.  Here, the facts

do not support the necessary element of knowledge that statements made were

false, or that statements were made with gross recklessness as to their truth.


    3.    <u>Intent to Deceive</u>.


       Nor has the plaintiff established that the debtor intended to deceive the

plaintiff by his advertisement of by his poor work performance.  The issue of

intent requires actual or positive intent.  <u>In re Carey</u>, No. 08-24396, 2010 WL

936117, *1 (D.N.J. Mar. 11, 2010).  "At the time of the representation, [a

debtor] must have intended by his representation to deceive the plaintiff."  <u>Id</u>.

<u>See</u> <u>also</u> <u>In re Chen</u>, 227 B.R. 614, 626 (D.N.J. 1998) (stating that "the intent to

deceive under § 523(a)(2)(A) . . . requires proof of a higher level of intent than

the <u>mens rea</u> that must be found" under the state law provision that prohibits

the knowledgeable making of false statements to obtain unemployment

benefits); <u>In re Young</u>, 181 B.R. 555, 558 (Bankr. E.D. Okla. 1995); <u>In re</u>

<u>Woodall</u>, 177 B.R. 517, 523 (Bankr. D. Md. 1995); <u>In re Nahas</u>, 181 B.R. 930,

933 (Bankr. S.D. Ind. 1994).  Because intent to defraud or deceive is rarely

admitted, the intent to deceive may be inferred from the surrounding facts and circumstances of the case, In re Reynolds, 193 B.R. 195, 200 (D.N.J. 1996); In re Nahas, 181 B.R. at 933, such as when the debtor makes a false representation that he knows or should know will induce the lender to make the loan. In re Nahas, 181 B.R. at 933. "The focus is . . . on whether 'the debtor's actions "appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor."'" In re Reynolds, 193 B.R. 195, 200-01 (D.N.J. 1996) (quoting In re Horne, 823 F.2d 1285, 1287 (8th Cir. 1987)). A showing of reckless indifference to the truth of the representations coupled with the knowledge that it would induce the action to be taken is also sufficient to satisfy an intent to deceive. In re Cohen, 185 B.R. 171, 177 (Bankr. D.N.J. 1994). See also In re Phillips, 804 F.2d 930, 934 (6th Cir. 1986); In re Horst, 151 B.R. 563, 568 (Bankr. D. Kan. 1993).

Here, we have no evidence of an actual intent to deceive, or circumstantial evidence to support that conclusion. On this record, the plaintiff fails to satisfy this element of the section 523(a)(2)(A) test as well.

B.      Section 523(a)(6).

Alternatively, the plaintiff seeks a determination that her claim is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). The plaintiff contends that the defendant willfully and maliciously caused injury to her by

32

"unlawfully, fraudulently, knowingly and intentionally performing substandard work on Plaintiff's home without obtaining permits and interim and final inspections." Adv. Compl. at 12, ¶ 35. The plaintiff asserts that the defendant took such actions to allow him to make use of "inferior and unsafe construction conditions." Pl. Brief at 14. She maintains that his poor workmanship was the direct cause of her damages. The plaintiff's request for relief in this regard must be denied.

Section 1328(a) provides that after the completion of all payments required under a Chapter 13 plan, the debtor will be granted a discharge of all debts provided for by the plan or disallowed, except:

> (1) provided for under section 1322(b)(5);
>
> (2) of the kind specified in section 507(a)(8)(C) or in paragraph (1)(B), (1)(C), (2), (3), (4), (5), (8), or (9) of section 523(a);
>
> (3) for restitution, or a criminal fine, included in a sentence on the debtor's conviction of a crime; or
>
> (4) for restitution, or damages, awarded in a civil action against the debtor as a result of willful or malicious injury by the debtor that caused personal injury to an individual or the death of an individual.

11 U.S.C. § 1328(a). Debts that would be nondischargeable under section 523(a)(6) are not included in the debts protected from discharge in a Chapter 13 case under section 1328(a)(2). Restitution that is awarded in a civil action as the result of a willful or malicious injury caused by the debtor is nondischargeable pursuant to section 1328(a)(4) to the extent that it "caused

personal injury to an individual or the death of an individual." 11 U.S.C. §

1328(a)(4).  In this case, we have allegations of property damage, but not of

personal injury or death.  The plaintiff's request must be denied.  See, e.g., In

re Torres, No. 09–02979, 2011 WL 381038, *4 (Bankr. D.Hawaii Feb. 2, 2011)

("Section 523(a)(6) does not apply in a chapter 13 case such as this one (where

the debtor did not cause personal injury).");  In re Miller, No. 10–60119, 2010

WL 3463296, *4 (Bankr. N.D.Ohio Sep. 2, 2010) ("Section 523(a)(6) debts are

covered by a general discharge in chapter 13 cases.

## **CONCLUSION**

For the reasons expressed above, the plaintiff is granted a judgment for

damages pursuant to the New Jersey Consumer Fraud Act.  Her claim is

established as $130,388.76 plus attorneys' fees.[21]  Her request for a

determination of nondischargeability pursuant to either 11 U.S.C. § 523(a)(2)(A)

or 11 U.S.C. § 523(a)(6) is denied.  Plaintiff's counsel shall submit an order in

conformance with this opinion.

Dated:  May 26, 2011

                                                    _____
                                                    JUDITH H. WIZMUR
                                                    CHIEF JUDGE
                                                    U.S. BANKRUPTCY COURT

---

[21]    Plaintiff's counsel may submit an affidavit of services, on notice to debtor and debtor's
counsel, within thirty (30) days of this opinion.